**The court incorporates by reference in this paragraph and adopts as the findings and analysis of this court the document set forth below. This document has been entered electronically in the record of the United States Bankruptcy Court for the Northern District of Ohio.**

**Dated: September 1 2026**

Mary Ann Whipple
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| In Re: | ) Case No. 22-31438 |
| | ) |
| Sherry K. Lowe, | ) Chapter 7 |
| Debtor(s). | ) |
| | ) Adv. Pro. No. 23-03012 |
| | ) |
| Andrew R. Vara, United States Trustee, | ) JUDGE MARY ANN WHIPPLE |
| | ) |
| Plaintiff, | ) |
| v. | ) |
| | ) |
| Sherry K. Lowe. | ) |
| Defendant(s). | ) |
| | ) |

**MEMORANDUM OF DECISION**

This adversary proceeding is before the court after trial on Andrew R. Vara, United States Trustee's ("Plaintiff" or "UST") complaint seeking to deny a discharge to Sherry K. Lowe, debtor in the underlying Chapter 7 case ("Debtor" or "Lowe"). Plaintiff alleges Debtor should be denied discharge under 11 U.S.C. § 727(a)(2)(A) [transfer of property of debtor], (a)(3) [concealment or failure to keep records], and (a)(4)(A) [false oaths]. Plaintiff's claims are based on alleged transfers of assets of Debtor's travel business, failure to keep adequate financial records for the business and to file income tax returns,

and false oaths on her statement of financial affairs and at the meeting of creditors in affirming the accuracy of her bankruptcy filing documents.

The district court has original and exclusive jurisdiction over Debtor's underlying Chapter 7 bankruptcy case as a case under Title 11. 28 U.S.C. § 1334(a). This adversary proceeding is a civil proceeding arising in a Chapter 7 bankruptcy case and arising under Title 11 over which the district court has original jurisdiction. 28 U.S.C. § 1334(b). Her Chapter 7 case and all proceedings arising in it, including this adversary proceeding, have been referred by the district court to this court for decision. 28 U.S.C. § 157(a) and General Order 2012-7 entered by the United States District Court for the Northern District of Ohio. This adversary proceeding is a core proceeding in which this court can make a final determination because it is an objection to discharge. 28 U.S.C. § 157(b)(2)(J).

This memorandum of decision constitutes the court's findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52(a), applicable to this adversary proceeding under Fed. R. Bank. R. 7052. Regardless of whether specifically referred to in this memorandum of decision, the court has examined all the evidence and reviewed the entire record of the case. Based upon that review, and for the reasons discussed below, the court finds Plaintiff is entitled to judgment in his favor denying Debtor's discharge in her Chapter 7 case.

## <u>FACTS</u>

<u>Procedural Background</u>

On September 27, 2022, Debtor filed her Chapter 7 petition. [Case No. 22-31438, Doc. # 1].[1] The case remains open, however, the Chapter 7 Trustee reports recovery of only proceeds from sale of a motor vehicle and presently does not expect to recover significant additional assets. [Case No. 22-31438, Doc. # 105]. After an extension of time to obtain documents from Lowe, Plaintiff timely filed his complaint to deny her discharge. [Case No. 22-31438, Doc. ## 52, 61, 74]. He later amended his complaint with leave of court to add allegations under § 727(a)(2)(A) about asset transfers and to remove certain claims. [Doc. ## 25, 26]. Trial proceeded on the three claims in the amended complaint.

[1] Although parts of the record from the underlying Chapter 7 case, *e.g.* the petition, schedules and related documents, were admitted at trial as Ex. 1, the court also takes judicial notice of the contents of the case docket and record in Debtor's Chapter 7 case. Fed. R. Bankr. P. 9017; Fed. R. Evid. 201(b)(2); *In re Calder*, 907 F.2d 953, 955 n.2 (10th Cir. 1990); *St. Louis Baptist Temple, Inc. v. Fed. Deposit Ins. Corp.*, 605 F.2d 1169, 1171-72 (10th Cir. 1979) (stating that judicial notice is particularly applicable to the court's own records of litigation closely related to the case before it); *United States v. Brugnara*, 856 F.3d 1198, 1209 (9th Cir. 2017) (stating that district court may properly take judicial notice of its own records).

Testimony at Trial

Lowe was the only witness at trial.

Lowe started her travel business called Fairy Tale Concierge ("Fairy Tale"), organized as an LLC, in November 2013, after working since 2009 as a travel agent for another agency. She closed her business in July 2022.

Fairy Tale was a virtual business, without a brick-and-mortar location, that operated with essentially just a computer, laptop and/or iPad and a printer. Lowe's sister-in-law, Heather McGregor, acted as her administrative assistant at times. McGregor was not paid wages or a salary; rather she also operated as an independent travel agent for Fairy Tale and was paid commissions at a percentage that accounted for her additional duties.

When Lowe started Fairy Tale in 2013, she opened a checking account at Trustmark National Bank (account ending in 9304). The name on the 9304 account is Sherry Lowe dba Fairy Tale Concierge. Lowe eventually had two bank accounts at Trustmark (the account ending in 9304 and a second account ending in 7629, the latter in the name Sherry Lowe dba Fairy Tale Concierge Secondary Account) and later, starting in February 2021, a bank account at Chase that she describes as a "personal account," [Ex. 30].

Except to the limited extent assisted by McGregor, Lowe herself operated both the front end of the business working with and cultivating travel suppliers and the back end of the business around finances and travel agent recruitment, payment and retention.

The Fairy Tale business was a cash basis operation. Lowe never prepared or had prepared separate cash flow statements, forecasts or budgets. It essentially operated out of the 9304 account, with its statements roughly functioning as a monthly cash flow statement. Records of the 9304 and 7629 accounts for calendar years 2020, 2021 and 2022 were produced to Plaintiff and are in evidence. [Exs. 14-19]. They show that substantial amounts of cash ran through the accounts, especially the "main" 9304 Trustmark account. For example, in January 2020, which turned out to be one of the last months of pre-COVID normal business operations of Fairy Tale, total deposits into the account were $117,481.60 and total withdrawals were $173,750.50. [Ex. 17, p. 17-1]. Essentially all receipts to the 9304 Trustmark account related to the business of Fairy Tale, whether payments earned as commissions from travel suppliers or, later, loans from the federal government and merchant cash advance lenders.[2] Business and personal expense payments from the 9304 account were made without delineation and routine reconciliation except

[2] A notable exception is the deposit of net proceeds of sale of Lowe's residence at 749 South Primrose, Lima, Ohio, in the amount of $100,596.60 on April 26, 2021. [Ex. 18, p. 18-59]. Lowe testified that she used those proceeds to pay both business and personal expenses.

as Lowe was able to recall and categorize what expenses were paid on behalf of Fairy Tale and what expenses were personal living expenses or in connection with tax return preparation. Lowe treated as personal income any funds that were not used to pay expenses of Fairy Tale.

The business operated using independent travel consultants who booked vacations for their clients under the Fairy Tale umbrella and its IATA and CLIA travel trade organization certification numbers. Eventually Fairy Tale operated with approximately 140-160 independent travel agents whom Lowe had recruited. Fairy Tale annually provided Form 1099s prepared by Lowe to its independent contractor travel consultants and IRS to report their commission earnings, including for its partial last year of operations in 2022.

Fairy Tale's most substantial vacation supplier was Disney, which enabled enhanced commissions for the business and specialized expertise, experiences and discounts for its customers through the independent travel consultants. Fairy Tale received commission payments of varying percentages from vacation suppliers when customers paid for and "closed out" their trips. Fairy Tale then paid the independent travel consultants an agreed-upon contractual percentage of the commission paid to Fairy Tale by the supplier. Different travel consultants were paid different percentages by contract. [*E.g.* Ex. 29]. Lowe used the 9304 Trustmark bank account records to keep track of payments coming in from vacation providers and payments out to PayPal for Fairy Tale independent travel consultants.

Agents submitted their own client trip booking information to Fairy Tale more or less in real time through a system called TESS. The only TESS ledger produced and in evidence is an example for months in 2022, however, it was printed out in the name of Heather McGregor on December 6, 2022, after business operations under Lowe had closed.[3] [Ex. 2]. The example produced shows information by agent name, client booking number, booking date, supplier, package price, commission earned and average overall percentage. While it appears that this information could function as a cash flow forecasting tool, there is no indication that Lowe used it as such. On a monthly basis agents submitted a spreadsheet of their closed out client trips on which they were entitled to commissions and which Lowe then reconciled with bank and TESS records to pay them commissions, mostly through PayPal, by debiting funds from the 9304 account. Fairy Tale's PayPal records for the period from February 1, 2021, through July 31, 2022, are in

---

[3] The records were apparently accessed or available through a business account that included e-mail, although copies may have been stored in Lowe's basement. After the business closed, Lowe lost access at some point to records, communications and information available through the account because she stopped paying the bill for the service that enabled it due to a lack of funds.

evidence. [Ex. 3]. Like the 9304 bank account, they show intermingled payment of both business expenses and personal expenses.

Lowe prepared her own income tax returns using TurboTax. She accounted for profit and loss from Fairy Tale's business operations on Form 1040 Schedule C. The last year for which she prepared and filed a return was 2019. [Ex. 28]. By the time of trial, Lowe had not filed tax returns for 2020, 2021, 2022 or 2023.

Lowe described 2019 as the best year for the business. For 2019 she reported gross receipts from Fairy Tale of $1,366,663 and total expenses of $1,121,906, including $1,066,876 in expenses for contract labor. [Ex. 28, p. 28-12]. The reported net profit of Fairy Tale for 2019 was $242,747. [*Id.,* line 31]. Lowe in turn reported that amount as her "other income" on line 7b of her 2019 Form 1040, with her taxable income for 2019 reported on line 11b as $218,678. [*Id.*, p. 28-8]. She calculated that she owed IRS total taxes (including an estimated penalty of $2,292) of $77,222, having made no quarterly estimated tax payments for tax year 2019 in 2019 and 2020. [*Id.,* p. 28-9].

Lowe's bankruptcy petition Schedule E shows that by 2020 she already owed substantial unpaid income tax debts: $31,791 for 2018 and $85,467 for 2019. [Case No. 23-3012, Doc. #1, p. 22/109]. She scheduled a total federal tax debt of $194,480, of which she listed $109,013 as priority debt. [*Id*.]. The court infers from these debts that Lowe failed to account in her cash business operations for ongoing income tax obligations through estimated tax payments for those years. Her bank records show that she did not do so for subsequent years.

IRS filed a claim, Claim No. 34-1, in the total amount of $508,412.99. Its amounts differ from the amounts scheduled by Lowe. For tax year 2019, IRS shows assessed tax due as a priority of $74,930 plus interest to the petition date of $5,707.59 (compared to her return amount of $77,222). For tax year 2020, IRS shows an estimated tax due as a priority of $295,428.31 plus interest to the petition date of $15,435.57. The amount is shown as estimated "based on available information because the return has not been filed." No amounts are shown as due or estimated by then for 2021 or 2022. For tax year 2017, IRS shows assessed tax due as a general unsecured claim of $14,467 and interest to the petition date of $11,855.54. For tax year 2018, IRS shows assessed tax due of $30,498 and interest to the petition date of $4,484.89. There is also a small amount identified for excise tax as a general unsecured claim for tax year 2018. Lastly, the IRS claim shows penalty amounts on both the priority claims and the general unsecured claims.

Lowe also scheduled a tax debt to the State of Ohio of $5,000, with the date incurred shown as 2019 followed by a question mark, the amount of priority v. non-priority debt shown as unknown and an income tax lien filed in the Allen County, Ohio Court of Common Pleas for an unknown tax year. [Case

No. 23-3012, Doc. #1, p.23/109]. State of Ohio Department of Taxation filed Claim No. 19-1 in the total amount of $4,054.73. Its claim only addresses tax year 2018, showing a total general unsecured assessed tax debt including tax, interest and a penalty of $4,054.73. The amount is estimated because "the required returns were not remitted at the time this claim was filed." There is also no indication that by the time of trial Lowe had filed state income tax returns for 2019, 2020, 2021 or 2022.

In a familiar story, the COVID-19 pandemic took an enormous toll on Fairy Tale's business in 2020, for obvious reasons. Existing bookings were canceled and bookings for future travel dropped sharply starting in March 2020 as the reality of the pandemic became clearer. It is fair to say the business did not recover from the shock of the COVID-19 pandemic. Somewhere along the line the combined cash needs of Fairy Tale and Lowe no longer matched the cash coming in from travel bookings. Fairy Tale was never able to recover sufficient cash flow to overcome the financial hole resulting from the pandemic.

As trips had to be canceled, no commissions were paid by suppliers to Fairy Tale or by Fairy Tale to its agents. Fairy Tale took from the federal government Paycheck Protection Loans in the total amount of $199,000 in 2020 and 2021 and an Economic Injury Disaster Loan in the amount of $149,000 to keep going and to prop up its agents, even as things started to get better in 2021. Even though the travel consultants were not entitled to commissions on the canceled trips, Lowe paid them anyhow. Fairy Tale used the federal loans to pay commissions for canceled trips to independent travel advisers that had worked with it to book customer vacations and for expenses, including her personal living expenses incurred during that time. Some of those loans were forgiven. While Fairy Tale received some tale commissions in 2020, 2021 and 2022, Lowe did not know the amount and does not now have records from which they can be determined. She had no other source of income, and has not filed 2020-, 2021- or 2022-income tax returns.

At least as early as June 2021, bank statements reflecting automatic repayment withdrawals show Fairy Tale started borrowing from merchant cash advance lenders (*e.g.* The Fundworks, Fusion Funding, Orange Funding, G&G Funding, Pinnacle Business) for operating capital. [*E.g.,* Ex. 18, p. 18-127, pp. 18-233—18-240; Ex. 19, pp. 19-8 —19-15, pp. 19-96—19-103]. By May 2022, the 9304 account shows substantial NSF fees being incurred. [Ex. 19, pp. 19-89 and 19-103]. The automatic periodic cash withdrawals by merchant cash advance lenders from the 9304 bank account became irreconcilable with the cash nature of Fairy Tale's business operations, which she could no longer control as their automatic periodic repayment withdrawals escalated.

Lowe sold her residence in Lima, Ohio on April 26, 2021, receiving net proceeds of $100,596.60. In connection with the sale of her home, she leased a self-storage unit from June, 2021 through June, 2022.

Lowe also used funds to support her daughter Emma's nail salon business, Studio 808, formed with an effective date of January 27, 2022, including by paying studio rent and buying supplies.

By December 2021, Lowe began setting up another travel business called Fairy Tale Elite Travel LLC. Fairy Tale Elite Travel LLC was registered in Florida on May 13, 2022, with Heather McGregor, her sister-in-law, as registered agent. In June 2022, Lowe transferred funds to McGregor to pay commissions overdue to Fairy Tale's independent travel consultants, some of whom were less than understanding, to put it mildly. Around that time, Fairy Tale was unable to pay its independent travel consultants, its loan creditors and even Lowe herself, and ceased operations. With Disney's approval, Lowe transferred outstanding vacation bookings from Fairy Tale to other agencies, including Fary Tale Elite Travel LLC, instead of cancelling them outright because she was closing Fairy Tale. She transferred the IATA number from Fairy Tale to FTC Elite Travel and closed the two bank accounts at Trustmark in July 2022. Lowe received no consideration for these transfers. It was Lowe's understanding that if she had not been able to transfer bookings to other agencies, which Disney only reluctantly authorized, Disney would have just canceled them when Fairy Tale stopped operating; provider trip cancellations would have deprived customers of planned travel experiences and independent travel consultants of anticipated commissions. Also, in or sometime after July 2022, due to non-payment, Lowe lost access to her e-mail account, which was tied to Fairy Tale, cutting her off from an important source of records, information and documents for the business.

After closing Fairy Tale, Lowe left the travel business and became an employee at the Lima City Schools in August 2022. By July 2022, Lowe began to consider filing for bankruptcy relief and contacted a bankruptcy attorney.

## ANALYSIS

Plaintiff's amended complaint sets forth three claims upon which it argues the court should deny Lowe a Chapter 7 discharge: 11 U.S.C. § 727(a)(2)(A) [transfer of property of debtor], (a)(3) [concealment or failure to keep records], and (a)(4)(A) [false oaths]. Plaintiff has the burden of proof at trial on a complaint objecting to discharge. Fed. R. Bankr. P. 4005. "The elements of a violation of 11 U.S.C. § 727 must be proven by a preponderance of the evidence." *Keeney v. Smith (In re Keeney)*, 227 F.3d 679, 683 (6th Cir. 2000).

The court will address each claim in turn.

**I. 11 U.S.C. § 727(a)(2)(A)**

A debtor will be denied a discharge where:

> the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—
>
> (A) property of the debtor, within one year before the filing of the petition.

11 U.S.C. § 727(a)(2)(A). To prevail under § 727(a)(2)(A), Plaintiff must establish two elements by a preponderance of the evidence: "(1) a disposition of property, such as concealment, and (2) 'a subjective intent on the debtor's part to hinder, delay or defraud a creditor through the act of disposing of the property.'" *In re Keeney*, 227 F.3d at 683 (citation omitted). There are two additional tacit requirements concerning the disposition element reflected by the statute, perhaps best characterized under the *In re Keeney* formulation as elements 1A and 1B. *In re Worrell,* No. 12-61021, 2013 WL 4525227, at *2 (Bankr. N.D. Ohio Aug. 26, 2013); *Vara v. Motil (In re Motil),* No. 22-10571, Adv. Pro. No. 22-1084, 2023 WL 187156, at *4 (Bankr. N.D. Ohio Jan. 13, 2023). They are, first, that the subject property must be property of the debtor and second, the disposition must have occurred within a year of the bankruptcy filing. *Id.*

Plaintiff's claim under § 727(a)(2)(A) is based on Lowe's transfer of the Fairy Tale concierge bookings, without consideration, as she closed the business and on her transfer of funds to Heather McGregor within one year before filing her petition on September 27, 2022. [Doc. # 26, pp. 15-16, ¶¶ 92-94].

<u>First Element: Transfer of Property of the Debtor Within One Year Prior to Filing the Petition</u>

Plaintiff's claim under § 727(a)(2)(A) is based on three types of transfers. The first is Lowe's transfer of Fairy Tale's customer bookings to Fairy Tale Elite Travel LLC and other agencies [*e.g*. Ex. 4] as she shut down the business. The transfers are shown by Lowe's testimony and Exhibits 2-5. The second is Lowe's right to income from the bookings transferred, which would be amounts exceeding what was needed to pay Fairy Tale's creditors. The third is Lowe's transfers of funds from her PayPal account to Heather McGregor. [Ex. 8]. If the other elements are met, there is no dispute the transfers occurred within one year of the filing of the petition on September 27, 2022.

1. <u>Transfer of Fairy Tale Customer Vacation Bookings</u>

Exhibit 4 is a compilation of letters dated July 23 and 26, 2022, requesting the transfer of Fairy Tale bookings to other travel agencies. Exhibit 5 is the UST's summary of transferred bookings, titled "Fairy Tale Concierge LLC Booking Transfers 2022." Lowe testified and the court finds that the bookings transferred were for travel that had not yet occurred. The information on Exhibit 5 about the transferred bookings shows a vacation package price total of $414,738.54 where that information is known and

potential commissions based on that total of $37,415.98. [Ex. 5, p. 5-8]. The court sees two issues with whether transfer of the customer bookings amounts to a "transfer of property of the debtor" within the meaning of § 727(a)(2). The first is whether the vacation bookings were "property." The second is, if they were property, whether the transferred bookings were "property of the debtor."

Debtor's counsel argued that the bookings had no value when they were transferred because client vacations had not yet been paid for and taken. Lowe's testimony persuasively showed that when she shut down the business, vacation providers would ordinarily have canceled Fairy Tale's outstanding agency bookings. Disney's standard policy was not to allow transfer of client bookings to a different agency, which was the answer she first got when she raised the issue with her Disney District Sales Manager. The bookings were not saleable. Based on Lowe's uncontradicted testimony about business operations, the court understands that vacation bookings would mature into Fairy Tale's right to receive commissions from those bookings when vacations were paid for and taken. Lowe estimated that, due to customer-friendly provider cancellation policies, routinely some 20% of bookings never matured into commission payments. While the evidence shows that Fairy Tale did not have to take further steps to earn those commissions, the bookings were subject to the varying cancellation policies of the vacation providers and therefore out of Fairy Tale's control. As Lowe testified, "just because a booking exists doesn't mean it's going to happen." The other evidence about Fairy Tale's business operations is consistent with that statement. The COVID-19 pandemic painfully illustrated that fact. Existing vacation bookings were canceled because of the pandemic, leaving Fairy Tale without commission revenue and no demonstrated right to demand and recover revenue for the canceled bookings. Nor did Fairy Tale owe its agents any commissions on the canceled bookings because trips were not closed out.

The statute uses only the word "property" in § 727(a)(2)(A), not "property of the estate," self-evidently because the relevant time period is during the year before a petition is filed. The bankruptcy estate has not yet been created when transfers within the scope of § 727(a)(2)(A) have occurred. There is no separate definition of the word "property" in the Bankruptcy Code. The old standby, dictionary definitions of "property," are all over the place and simply unhelpful. Nevertheless, it makes sense to consider the broad concept of property of the estate under 11 U.S.C. § 541(a), because any property of the Debtor within the meaning of § 727(a)(2)(A) that Debtor did not transfer within the year before the filing of the petition and that was still owned at filing would become property of the estate under § 541(a) and within the meaning of related § 727(a)(2)(B). *Moyer v. Geer (In re Geer),* 522 B.R. 365, 393 (Bankr. N.D. Ga. 2014) ("A prohibited transfer under Section 727 must be a transfer of property of the debtor that otherwise would have been property of the estate under 11 U.S.C. § 541."). A Chapter 7 trustee's rights

in property under § 541(a)(1), as successor to a debtor, expansively include "all legal or equitable interests of the debtor as of the commencement of the case," though such rights generally are no greater than the right of the debtor on the petition date. *In re Klinger,* No. 18-33456, 2020 WL 1671555, at *3 (Bankr. N.D. Ohio Apr. 1, 2020)(citing *Demczyk v. Mut. Life Ins. Co. of NY (In re Graham Square, Inc.),* 126 F.3d 823, 831 (6th Cir. 1997)). Notably, as the Supreme Court opined in *Segal v. Rochelle,* 382 U.S. 372, 379 (1966), a seminal Bankruptcy Act case, "the term 'property' has been construed most generously, and an interest is not outside its reach because it is novel or contingent or because enjoyment must be postponed." Certainly, Congress did not narrow the Bankruptcy Act concept of "property" in enacting § 541(a)(1) of the Bankruptcy Code.

The determination of whether a debtor's interest in property becomes property of the bankruptcy estate is a question of federal law. *Vaughan v. Booth (In re Booth)*, 260 B.R. 281, 285 (B.A.P. 6th Cir. 2001). However, state law controls the question of whether the debtor has an interest in property. *See Butner v. United States,* 440 U.S. 48, 54 (1979) ("Congress has generally left the determination of property rights in the assets of a bankrupt's estate to state law."); *F.D.I.C. v. AmFin Financial Corp.,* 757 F.3d 530, 536 (6th Cir. 2014). As stated in *Butner,* "[p]roperty interests are created and defined by state law. Unless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding." *Butner,* 440 U.S. at 55.

Ohio law applies in this case. Under Ohio law, a vested interest in property "is one in which there is a present fixed right of either present or future enjoyment." *Cleveland Trust Co. v. McQuade*, 106 Ohio App. 237, 248, 142 N.E.2d 249, 256 (1957). It does not appear from the evidence that the bookings represented a present fixed right to either present or future enjoyment, because they were subject to cancellation outside of the control of Fairy Tale as occurred during the COVID-19 pandemic. As the transferred bookings were for vacations that had not yet been taken, they were not a "vested" interest in property under Ohio law when they were transferred.

The Ohio appellate court in *Cleveland Trust Co.* described a contingent interest in property as "one in which there is no present fixed right of either present or future enjoyment; but in which a fixed right will arise in the future under certain specified contingencies.'" *Id.*, 106 Ohio App. at 248, 142 N.E.2d at 257. Further, "[i]t is proper to say that a contingent interest is a future interest, and that a future interest is one which involves a postponement of the possession and enjoyment of property." *Id.*, 106 Ohio App. at 249; 142 N.E.2d at 257. A contingent interest in property under Ohio law is fully alienable and may be attached by creditors. *In re Booth,* 260 B.R. at 285, (citing *Moore v. Foresman,* 172 Ohio St. 559 (1957));

*In re Miller*, No. 10-15891, 2011 WL 3741846, at * 3 (Bankr. N.D. Ohio Aug. 24, 2011); *see In re Greer,* 242 B.R. 389, 399 (Bankr. N.D. Ohio 1999). Contingent interests in property are property within the meaning of § 541 and thus § 727(a)(2)(A) in the court's view. *In re Booth,* 260 B.R. at 285-286; *see DeMarco v. Ohio Decorative Products, Inc.*, unpublished Table Decision, 19 F.3d 1432, at *7 (6th Cir. 1994). The question before the court is whether the transferred bookings were contingent interests in property under Ohio law.

Although a close question, because Debtor testified that the bookings were not saleable, the court nevertheless finds that Plaintiff has shown by a preponderance of the evidence that in transferring the bookings there was a transfer of property. The bookings conferred on Fairy Tale a fixed right to commissions that would arise in the future under certain specified contingencies, namely that trips were not canceled and were paid for and taken by the client. Had Disney not authorized transfer of the bookings to the other travel agencies, including FTC Elite, the evidence shows they would have been canceled. There would not have been anything to transfer that would have matured into paid commissions. But Disney (and others) authorized the transfers to occur within a short window of time, which allowed them to be contingent interests in property under Ohio law.

Rather, a more difficult issue is whether the transferred bookings were property *of the Debtor,* as required by the statute, *versus* property of Fairy Tale Concierge LLC as a separate entity. This issue was raised and comprehensively addressed by the court in *In re Motil,* first in the context of a motion to dismiss the complaint. The defendant debtor in *In re Motil* sought dismissal of plaintiff's § 727(a)(2)(A) claim "because the U.S. Trustee alleged a transfer of property belonging only to an L.L.C. under the debtor's control, not a transfer of property owned by the debtor directly." *In re Motil,* 2023 WL 187156, at *4. This judge agrees with the legal analysis of Judge Harris in *In re Motil* on this point. He starts with "the general rule is that a corporate entity owns the assets of that entity, even if the debtor completely owns and controls the entity," *id.,* as is the situation with Lowe and Fairy Tale in this case. Thus, the court noted, "without more, the property of an L.L.C., even one completely owned by the debtor, cannot constitute the debtor's property for purposes of § 727(a)(2)(A)." *Id.* In *In re Motil,* as in this case, the U.S. Trustee argued "that something more" existed because the debtor was an alter ego of the L.L.C., making the L.L.C.'s property the debtor's property. As Judge Harris observed, however, courts disagree whether an alter ego theory works under § 727(a)(2)(A), further noting that there is no binding precedent on this proposition from the Sixth Circuit. *Id.* He persuasively distinguished a Sixth Circuit case, *Barclay's/Am. Bus. Credit, Inc. v. Adams (In re Adams),* 31 F.3d 389, 394 (6th Cir. 1994), *cert. denied,* 513 U.S. 1111 (1995), that is sometimes cited in support of an alter ego theory as sufficient to support a claim under § 727(a)(2)(A).

Stating his general agreement with courts adopting the narrower reading of § 727(a)(2)(A), Judge Harris nevertheless declined to dismiss the U.S. Trustee's claim at the pleading stage.

Later, after trial in *In re Motil*, Judge Harris definitively reanalyzed and rejected the state law alter ego or veil piercing theory being advocated by the U.S. Trustee in support of his § 727(a)(2)(A) claim, ruling in the debtor's favor thereon. *Vara v. Motil (In re Motil)*, No. 22-10571, Adv. Pro. No. 22-1084, 2023 WL 3991639, at *17–*21 (Bankr. N.D. Ohio June 13, 2023). Again, this judge agrees with Judge Harris's legal reasoning after trial in *In re Motil*, specifically that the property in issue transferred must actually be "'property of the debtor' at the time of the transfer, as opposed to becoming property of the debtor only though some later court determination." *Id.*, at * 21.

Agreeing with the legal analysis of Judge Harris in his *In re Motil* decisions, the court rejects use of an alter ego theory in this case as argued by Plaintiff and in cases such as *United States Trustee v. Zhang (In re Zhang)*, 463 B.R. 66, 79–82 (Bankr. S.D. Ohio 2012). Construing § 727(a)(2)(A) under an alter ego theory of what is "property of the debtor" also violates the basic interpretational principle, sometimes cited but not actually applied, that exceptions to discharge are to be construed strictly in favor of the debtor. *Miller v. Wylie (In re Wylie),* 119 F.4th 1043, 1045 (6th Cir. 2024); *United States v. Storey,* 640 F.3d 739, 743 (6th Cir. 2011); *Buckeye Ret. Co. v. Swegan (In re Swegan)*, 383 B.R. 646, 653 (B.A.P. 6th Cir. 2008).

Moreover, the court disagrees that the record around the transfers based on the front end of Fairy Tale's business process, which is what is at issue with the transfer of the bookings, supports an alter ego theory or veil piercing as a matter of fact. The evidence shows that the bookings transferred were secured by Fairy Tale independent travel agents using Fairy Tale's IATA and CLIA numbers. The travel agents had contracts with Fairy Tale. The transfer request letters in evidence at Ex. 4 all reference Fairy Tale Concierge LLC, via Sherry Lowe, as requesting release of bookings to other agencies, in the caption of the letters, the printed stationary logo and in Lowe's signature of the letters. Exhibit 5 is captioned "Fairy Tale Concierge, LLC Booking Transfers 2022." The IRS Form 1099-NECs issued to travel agents for Calendar Year 2022 were issued by Fairy Tale Concierge LLC using its TIN. [Ex. 6].

Plaintiff's alter ego/veil piercing argument is based in fact on Debtor's handling of the 9304 Trustmark bank account and the PayPal account. Suppliers paid Fairy Tale commissions into that account, which she used to pay both business and personal expenses, often via transfers out to the PayPal account, from which both business and personal expenses were paid. However, Lowe was able to and did use the 9304 account statements, TESS records and PayPal records to prepare Form 1099s for the travel agents and to report her business income on IRS 1040 Schedule C, which is a permissible tax reporting method for LLCs such as Fairy Tale. The court finds as a matter of fact that the handling of the accounts does not

make Debtor an alter ego of Fairy Tale, even if § 727(a)(2)(A) does support such an analysis as a matter of law. *Cf. Bavely v. Daniels (In re Daniels),* 641 B.R. 165, 195-97 (Bankr. S.D. Ohio 2022).

While the transfer of the travel bookings to other agencies was a transfer of property within the meaning of § 727(a)(2)(A), the court finds that the transfers were not transfers of property of the Debtor within the meaning of § 727(a)(2)(A).

2. Lowe's Right to Income from the Bookings That Were Transferred

Plaintiff argues that if the court disagrees that transfer of the customer travel bookings to other agencies is a transfer of property of the Debtor, in the alternative their transfer amounted to a transfer of Lowe's right to future income from them as property of hers or of the bankruptcy estate. In the ordinary course of the Fairy Tale business, had the bookings been retained by Fairy Tale Concierge, not been canceled by suppliers or customers, and client trips paid for and ultimately taken, payment of supplier commissions to Fairy Tale through account 9304 would have occurred. The evidence showed that all supplier commission payments were deposited initially into the 9304 bank account. Debtor paid both Fairy Tale expenses and her personal expenses from and through the 9304 bank account. The only reconciliation of what she was entitled to as personal income was through the process of preparing and filing federal income tax returns, which last occurred in 2019. Thereafter, Fairy Tale incurred substantially more debt through borrowing, resulting in a (fatal) increase in monthly expenses via merchant cash advance lender automatic account withdrawals. The court finds that Plaintiff has not proven by a preponderance of the evidence as a matter of fact under § 727(a)(2)(A) (or (B)) that Lowe would have been entitled to any income from the transferred bookings when and if they eventually matured into revenue. The argument is speculative at best based on the evidence.

3. Transfers From PayPal Account to Heather McGregor

Plaintiff's Exhibit 8 is a summary of transfers to Heather McGregor in calendar year 2022 from the PayPal account compiled from subpoenaed Pay Pal account records dated from 2/1/22 through 7/31/22, [Ex. 3], and the IRS Form 1099s prepared by Lowe for commissions paid to McGregor in 2022, [Ex. 6, pp. 6-109—6-112]. It shows payments reported on Form 1099s adding up to $7,767.44 and payments from 6/17/22 to 7/27/22 adding up to $13,412.31 more than the commission payments reported on the Form 1099s. The transfers to McGregor shown on the PayPal records from 1/3/22 through 6/9/22 add up to the $7,767.44 amount that matches the Form 1099s issued by Fairy Tale to McGregor for calendar year 2022. The court finds that these transfers were made in the ordinary course of business on account of commissions earned by McGregor.

The focus of the issue is on the additional payments made to McGregor from 6/17/22 through 7/27/22 in the total amount of $13,412.31. There were seven payments: $5,100 on 6/17/22; $1,400 on 6/24/22; $2,500 on 7/1/22; $300 on 7/7/22; $700 on 7/14/22; $1,800 on 7/23/22; and $1,612.31 on 7/27/22. Lowe testified and the court finds that these payments were made to McGregor so that she could use the funds to pay Fairy Tale travel agents' commissions that they were owed based on completed trips. Lowe said she could not connect with some of them directly any longer and did not have their spread sheets. They were overdue and, as she put it, "people were getting antsy." "They were made so agents could get their money." Lowe had verbal confirmation, but not written confirmation, from McGregor that the payments were used for that purpose.

In contrast to the transfer of the bookings and Lowe foregoing potential income because of those transfers, these payments were more obviously transfers of property clearly traceable to the 9304 account and the PayPal account. Nevertheless, the question remains whether they were transfers of property of the Debtor or property of Fairy Tale. The fact suggesting that the payments were transfers of Fairy Tale's funds, not Lowe's funds, is that all the funds in the 9304 account at that time were derived from Fairy Tale's business operations. Facts suggesting that the payments were transfers of Lowe's funds are that the 9304 account was titled "Sherry Lowe dba Fairy Tale Concierge" and that she never really kept records reconciling business expenses and funds available for personal expenses on any periodic basis. Essentially, she eyeballed it. The court finds that the facts support by a preponderance Plaintiff's argument that the $13,412.31 in transfers were of property of the Debtor under § 727(A). Even though the court does not believe the evidence overall shows an alter ego relationship, the intermingling of expenses and account uses as between business and personal for both the 9304 account and the PayPal account come into play on this issue.

<u>Second Element: Intent to Hinder, Defraud or Delay</u>

As explained, the court has decided that the only transfers raised by Plaintiff that were of property of the debtor within the meaning of § 727(a)(2)(A) were the payments made to Heather McGregor. Although the court therefore need not address Debtor's intent other than as to those transfers, it will do so for the sake of completeness. For the most part, the same analysis applies to all three of the transfer types argued by Plaintiff.

"It is undisputed that § 727(a)(2) requires culpable, specific intent to trigger the denial of a discharge." *In re Wylie,* 199 F.4th at 1046. Plaintiff must establish by a preponderance of the evidence that Debtor's transfers were made with "actual" intent to hinder, delay or defraud a creditor. *Id.* Because the phrase "intent to hinder, delay, or defraud" in § 727(a)(2)(A) is in the disjunctive, Plaintiff need not

prove that Debtor intended to hinder, delay and defraud a creditor; proof of any one act is sufficient. *McDermott v. Kerr (In re Kerr)*, No. 15-30531, 2017 WL 3880875, at *14 (Bankr. N.D. Ohio Aug. 30, 2017).

The meaning of an intent to hinder or delay has been persuasively characterized as follows:

> The Bankruptcy Code [also] does not define an intent to "hinder" or an intent to "delay." According to the Oxford English Dictionary, the term "hinder" means to "keep back, delay; impede; obstruct; prevent." It defines "delay" as "put off to a later time; postpone, defer." In keeping with this plain meaning, courts have held that a debtor acts with an intent to "hinder" if he or she acts with ". . . an intent to impede or obstruct" creditors and an intent to "delay" if he or she acts with ". . . an intent to slow or postpone creditors." Others have stated more generally . . . that to act with "intent to hinder or delay" is to "act improperly to make it more difficult for a creditor to collect a debt."

*Wise v. Wise (In re Wise),* 590 B.R. 401, 435 (Bankr. E.D. Mich. 2018)(quoting *Wiggains v. Reed (In re Wiggains)*, Nos. 13-33757-SGJ-7, 14-03064-SGJ, 2015 Bankr. LEXIS 1460, at *64 (Bankr. N.D. Tex. Apr. 27, 2015)). Section 727(a)(2)(A) does not require "proof of harm," or that a creditor "must have, in fact, been hindered, delayed or defrauded." *In re Keeney*, 227 F.3d at 685 (citation and quotations omitted).

Plaintiff argues that Lowe intended the transfers at issue to hinder or delay the relentless collection efforts of the merchant cash advance lenders that, by June of 2022, were automatically making periodic withdrawals of funds from the 9304 account in amounts that made the business no longer sustainable. The account records for the 9304 account confirm that fact. However, the court disagrees for two reasons that Lowe intended by her actions to hinder or delay the merchant cash advance lenders' collection efforts.

First, the court finds that the $7,767.44 in payments to McGregor on account of her earned commissions were made in the ordinary course of Fairy Tale's business operations. McGregor was treated like the other Fairy Tale travel consultants during 2022 until Lowe determined to shut down the business. The Form 1099s and the PayPal records confirm that point. The timing of those payments counters the argument that they were made with intent to obstruct or delay the merchant cash advance lenders. The court finds that Lowe did not intend by those payments to McGregor to hinder or delay the merchant cash advance lenders.

Second, as to the other transfers identified by Plaintiff, including the additional $13,412.31 in payments made to McGregor from 6/17/22 to 7/27/22, the court finds that Lowe's intent was twofold: to protect clients of the business by preserving their booked vacations and to protect the contingent interest in commissions (or vested as to the $13,412.31 in payments) of the Fairy Tale travel consultants.

Lowe testified repeatedly that, had the bookings not been transferred with vacation provider permission as she shut down Fairy Tale, Disney and others would have canceled them. Her testimony on this point was credible and persuasive. Under the Fairy Tale business model, as emphasized by the pandemic, canceled bookings meant no revenue for Fairy Tale and no commissions for the travel agents. By extension, canceled bookings would also have meant no more cash for the merchant cash advance lenders to draw on from the 9304 account. Lowe also testified without contradiction that the bookings were not transferable or saleable from the vacation providers' perspectives. In theory, Lowe could have negotiated with the travel consultants for some risk-based compensation in exchange for Fairy Tale's facilitation and agreement to transfer the bookings to other agencies. That argument is speculative and undeveloped on the record, particularly given the short window within which Lowe was given to act by Disney. While value is not the *sine qua non* of a transfer within § 727(a)(2)(A), the lack thereof, which Debtor argued, shows lack of intent to hinder, delay or defraud.

Plaintiff elicited testimony and presented documents showing that Lowe took steps to set up another travel agency, called FTC Elite Travel, LLC. As Lowe conceived it, the purpose was for her to diversify and tap into a new business line. The name and the business model were intended to shift toward more upscale clientele and travel experiences than the Fairy Tale focus on Disney. The FTC Elite Travel, LLC entity was set up as a Florida LLC by Heather McGregor effective May 13, 2022. [Ex. 20]. Lowe transferred some bookings to that entity. But there is no evidence that Debtor owned it, operated it or functioned within that business umbrella to evade merchant cash advance lenders by setting up a new business or otherwise. While Debtor could not explain a page that Plaintiff unearthed listing her in something called Travel Leaders in 2023 as an FTC Elite Travel, LLC agent from Summerfield, Florida, without more the court remains unconvinced that Lowe was operating as a travel agent at that time. Rather, by the time Lowe transferred the bookings and advanced funds to McGregor to pay outstanding Fairy Tale agent commissions, she was getting out of and got out of the travel business. She went to work as an employee of the Lima City Schools in August 2022 and resides in northwest Ohio. Except as to a one-off booking for a relative in September 2022, there is no persuasive evidence that she remained in or reentered the travel business such that the court could infer Debtor's intent to hinder, delay or defraud creditors, specifically the merchant cash advance lenders, by setting up Fairy Tale Elite Travel, LLC as a new operation.

In summary, the court finds that Lowe did not act with intent to hinder, delay or defraud the merchant cash advance lenders. Rather, her motivation in transferring Fairy Tale bookings to other agents and making the $13,412.31 in payments to McGregor was to protect clients of the business and the agents

she had cultivated over the years to develop Fairy Tale's business. Another less savory aspect of seeking to protect the agent commissions is that some of them were downright vicious to Lowe as payment of agent commission started to lag due to merchant cash advance lender account withdrawals. The squeaky wheel phenomenon in the face of financial distress is a foundation of Bankruptcy Code preference law. Other courts, like this one, thus find that as a matter of law "the intent to prefer creditors is not equivalent to the intent to hinder, delay or defraud creditors" for purposes of § 727(a)(2)(A). 6 Collier on Bankruptcy, ¶ 727.02[3][c] (16th ed. 2026) (citing *Equitable Bank v. Miller (In re Miller),* 39 F.3d 301, 307 (11th Cir. 1994); *see In re Wylie,* 119 F.4th at 1047; *United States of America v. Winick (In re Winick),* 676 B.R. 89, 114 (Bankr. S.D.N.Y. 2026) (citation omitted). The court believes that the merchant cash advance lenders and their automatic account withdrawals caused Lowe to shut down Fairy Tale's business operations as no longer sustainable under the debt load. But the way Lowe implemented the cessation of Fairy Tale's operations did not equate to an intent to hinder, delay or defraud the merchant cash advance lenders. She was not obligated by § 727(a)(2)(A) or otherwise to keep the business running for the benefit of her creditors. The court finds it significant that she got out of the travel business altogether and went to work immediately as a public employee. Lowe did not specifically intend the *consequence* of hindering or delaying the merchant cash advance lenders, *i.e.* making it more difficult for them to collect their debts, which is the relevant inquiry under the statute. *See In re Wylie*, 119 F.4th at 1047.

For the foregoing reasons, the court finds that Plaintiff has not sustained his burden of proving by a preponderance of the evidence that Debtor's discharge must be denied under § 727(a)(2)(A).

**II. 11 U.S.C. § 727(a)(3)**

Plaintiff asks the court to deny Lowe's discharge under § 727(a)(3) for failure to keep recorded information. A debtor will be denied a discharge if she "has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information . . . from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case." 11 U.S.C. § 727(a)(3). The purpose of this provision is to give creditors, the trustee, and the bankruptcy court complete and accurate information concerning the status of the debtor's financial affairs and to test the completeness of the disclosures requisite to a discharge. *Meridian Bank v. Alten*, 958 F.2d 1226, 1230 (3d Cir.1992)(quotations omitted). It ensures that creditors are supplied with "dependable information on which they can rely in tracing a debtor's financial history". *Id.* In short, "adequate record-keeping [is] a predicate for a debtor's discharge." *Agai v. Antoniou (In re Antoniou)*, 527 B.R. 71, 78 (Bankr. E.D.N.Y. 2015). That said, the Bankruptcy Code does not operate in draconian fashion to require maintenance, preservation, and production of comprehensive records of every minute

detail of a debtor's financial and business activity as a precondition to a discharge. *AG Credit, ACA v. Walton (In re Walton)*, 165 B.R. 610, 616 (Bankr. N.D. Ohio 1994)(citing *James v. McCoy (In re McCoy)*, 114 B.R. 489, 500 (Bankr. S.D. Ohio 1990)).

Claims under § 727(a)(3) are analyzed using a two-step burden shifting approach. First, the plaintiff, here the UST, must establish a *prima facie* case showing the debtor failed to keep recorded information from which her financial condition or business transactions might be ascertained. *Turoczy Bonding Co. v. Strbac (In re Strbac)*, 235 B.R. 880, 882 (6th Cir. 1999); *Strzesynski v. Devaul (In re Devaul)*, 318 B.R. 824, 829 (Bankr. N.D. Ohio 2004); *In re Daniels,* 641 B.R. 165, 183 (Bankr. S.D. Ohio 2022). If the plaintiff makes such a *prima facie* showing, the burden shifts to the debtor to explain why the failure to maintain records was justified. *In re Daniels*, 641 B.R. at 183. In establishing the prima facie case and in satisfying this ultimate burden of proof, the plaintiff must prove its case by a preponderance of the evidence. *In re Keeney,* 227 F.3d at 683; *In re Adams*, 31 F.3d at 394; *In re Swegan*, 383 B.R. at 653. Because determining if a debtor's records are sufficient is a fact intensive inquiry, bankruptcy courts are given wide discretion in deciding whether to deny a debtor's discharge under § 727(a)(3). *Dolin v. N. Petrochemical Co. (In re Dolin)*, 799 F.3d 251, 253 (6th Cir. 1986). Plaintiff does not have to prove that a debtor acted with fraudulent intent in failing to keep or maintain recorded information to prevail under § 727(a)(3). *Razzaboni v. Schifano (In re Schifano)*, 378 F.3d 60, 70 (1st Cir. 2004).

The UST argues that Lowe "failed to maintain and/or provide documents by way of business profit and loss statements, business ledgers, tax returns, and or documents used to complete the Defendant's delinquent tax returns from which her financial condition can be ascertained." [Case No. 22-31438, Doc. # 26, pp. 16-17, ¶¶ 97-99].

<u>First Element: Failure to Keep or Maintain Recorded Information</u>

To meet his initial burden of going forward, the UST must (1) offer evidence of the general nature of Lowe's business or personal financial position and the types of transactions about which recorded information is sought, (2) present evidence identifying the recorded information he alleges has not been kept or preserved by Defendant, and (3) show how the missing recorded information might enable Defendant's actual financial condition or business transactions to be ascertained under the circumstances of the case. *In re Devaul,* 318 B.R. at 833.

Although the court holds that an alter ego analysis is not appropriate under § 727(a)(2)(A) to determine what constitutes property of the debtor, the court agrees with other courts that have held that the state of both a debtor's personal records and financial transactions and a related business's records and financial transactions can be properly considered under § 727(a)(3). *E.g. In re Daniels,* 641 B.R. at 184-85 (citations omitted). This is such a case because Debtor owned and operated Fairy Tale. She had no other source of income before she closed the business in July 2022. Lowe's personal financial well-being or lack thereof depended on the financial status of Fairy Tale and her decisions made about it at any given time. Fairy Tale's records or lack thereof are relevant to considering Lowe's personal record keeping and financial status for purposes of discharge in this case. *Pher. Partners v. Womble (In re Womble),* 289 B.R. 836, 857-58 (Bankr. N.D. Tex. 2003), *aff'd,* 299 B.R. 810 (M.D. Tex. 2003), *aff'd* 108 Fed. App'x 993 (5th Cir. 2004).

Plaintiff's § 727(a)(3) claim focusses on Lowe's undisputed failure to prepare or have prepared income tax returns for tax years 2020, 2021 and 2022. There is no dispute, and the court finds that Lowe has not prepared and thus could not provide to her attorney, the UST, the Chapter 7 case trustee or the court any federal income tax returns after 2019. Nor does it appear from the record that Debtor has prepared State of Ohio income tax returns since even before 2019; the State of Ohio filed a claim for unpaid taxes dating to 2018, estimated because Lowe did not file a state return. Nor are there any state income tax returns in evidence.

The issue in this case under § 727(a)(3) is whether Debtor "failed to keep or preserve" recorded information from which her financial condition might be determined. The UST does not argue that Lowe concealed, destroyed, mutilated or falsified recorded information. Under the statute, "keep" and "preserve" are not synonymous. Courts construe "keep" in the sense of creating a record, as in 'to keep a diary' or maintaining information, as by entering it in a record. *In re Devaul,* 318 B.R. at 833 (citations and quotations omitted). The "text of the statute does not merely require that the debtor not lose any records…[t]his language places an affirmative duty on the debtor to create books and records accurately documenting his business affairs." *Peterson v. Scott (In re Scott),* 172 F.3d 959, 969 (7th Cir. 1999). Many courts have addressed the failure to file pre-petition tax returns as failure to keep or maintain records within the meaning of § 727(a)(3). *See United States Trustee v. Joseph (In re Joseph),* 665 B.R. 783, 791, n. 10 (Bankr. E.D. Ky. 2024).

The court finds that Lowe's failure to prepare (or have prepared) federal income tax returns for tax years 2020, 2021 and 2022 and state income tax returns for at least tax years 2018 forward is a failure to keep recorded information under § 727(a)(3). That failure raises the question whether Lowe's missing tax returns are recorded information from which her financial condition and business transactions might be ascertained. As other courts reflect to varying degrees, income tax returns are the most basic of recorded information, essentially the minimum a debtor in her circumstances owning and operating a business would be expected to keep.

Some courts say that the absence of tax returns is the equivalent of a *per se* failure under § 727(a)(3) to keep recorded information from which a debtor's financial information might be ascertained. In *In re Womble*, relied upon by the UST and often cited by other courts, the bankruptcy court said that "a debtor's failure to file timely tax returns—especially for several years in a row—is a blatant example of a failure to maintain adequate records." *In re Womble,* 289 B.R. at 858; *see Nisselson v. Wolfson (In re Wolfson)*, 152 B.R. 830, 833 (S.D.N.Y. 1993) ("Income tax returns are quintessential documents 'from which the debtor's financial condition or business transactions might be ascertained…'"); *Fox v. Miller,* 589 B.R. 659, 665 (C.D. Cal, 2018) ("Appellant's failure to file tax returns provides another basis for denying Appellant's discharge under section 727(a)(3) because it prevents creditors and trustees from obtaining important financial information.").

Other courts advance a more lenient evidentiary view of a debtor's failure to file tax returns. *E.g.*, *Jou v. Adalian (In re Adalian),* 474 B.R. 150, 164 (Bankr. M.D. Pa 2012) ("[w]hile not alone dispositive, a debtor's failure to file timely tax returns—especially for several years in a row--is a blatant example of a failure to maintain adequate records." (cleaned up)); *Bell v. Claybrook (In re Claybrook)*, 385 B.R. 842, 852 (Bankr. E.D. Tex. 2008) ("Defendant's failure to file timely tax returns…to produce the documents underlying her tax returns, or to introduce allegedly filed returns in evidence are factors for the Court to consider under § 727(a)(3)."); *see In re Rigon,* No. 2:21-BK-11641-CMA, 2024 WL 4766214, at *10 (B.A.P. 9th Cir. Nov. 13, 2024), appeal dismissed, No. 24-7632, 2025 WL 1703510 (9th Cir. Apr. 3, 2025) (Spraker, J. concurring in part and dissenting in part, describing the failure to file tax returns as "strong evidence" of failure to keep and preserve records but that "the failure to file tax returns, by itself is insufficient to establish that a debtor failed to maintain and preserve records…."). These cases are less persuasive to the court because those courts tend to misstate the statutory standard as the lack of recorded information making it "impossible" to ascertain the financial condition of a debtor, instead of the lack of

recorded information from which parties in interest "might" ascertain a debtor's financial condition as the term used in § 727(a)(3). *See In re Devaul,* 318 B.R. at 831-32.

This court believes the analysis that comports best with the statute is that failure to file tax returns can alone be sufficient in some circumstances to constitute failure to keep recorded information from which a debtor's financial circumstances and business transactions might be ascertained. This is such a case. The crux of the case becomes whether debtor's failure to file tax returns was justified under all of the circumstances of the case.

The Bankruptcy Code and Official Bankruptcy Forms, *see* Fed. R. Bankr. P. 9009(a), show the fundamental (or "quintessential" as aptly described by the court in *In re Wolfson,* 152 B.R. at 833) importance of tax returns to every individual debtor's bankruptcy case. The Bankruptcy Code requires individual debtors to provide income tax returns to trustees and creditors.[4] Debtors are required to report on their Statement of Financial Affairs employment income and income from other sources for two years prior to commencing their case. A debtor's historic income becomes relevant to whether a motion to dismiss for abuse under § 707(b) based on the totality of her financial circumstances is appropriate. *See* 11 U.S.C. § 707(b)(3).

In the absence of filed tax returns from 2020 through 2022, Debtor's income for those years is unknown. This is specific information debtors are required to provide on their Statement of Financial Affairs, showing its importance to the bankruptcy process. Debtor's Statement of Financial Affairs in this case reports the source of her income for years 2020 and 2021 as only from "Operating a business" and the amount each year as "Unknown." [Ex. 1, p. 1-76–1-77, SOFA, Part 2, Qs 4 and 5]. Her Statement of Financial Affairs reports the source of her income for 2022 to the date of filing as both wages and from

[4] Section 521(e)(2) requires an individual debtor in a Chapter 7 or 13 case to provide to the case trustee no later than 7 days before the meeting of creditors a copy of her federal income tax return for the most recent tax year ending immediately before the commencement of the case and for which a return was filed. 11 U.S.C. § 521(e)(2). At the request of the of the court, the United States Trustee or any party in interest in a Chapter 7, 11 or 13 case, an individual debtor must file with the court (1) a copy of each federal income tax return with respect to each tax year ending while the case is pending and (2) at the same time as filed with Internal Revenue Service, each federal income tax return that had not been filed as of the date of commencement of the case and that was subsequently filed for any tax year of the debtor ending in the 3-year period ending on the date of the commencement of the case. 11 U.S.C. § 521(f)(1), (2), (3); *see* 11 U.S.C. § 521(g)(2) (availability of tax returns and amendments described under subsections (e)(2)(A) and (f)). Failure to provide tax returns as required may result in dismissal of a case. 11 U.S.C. § 521(e)(2)(B), (C); *see also* 11 U.S.C. § 521(j)(1). *Cf.* 11 U.S.C. §§ 1306, 1308.

.

operating a business, with the amount of her wages stated as $3,000 and the income from operating a business again as "Unknown." [*Id.*]. Debtor has not amended her Statement of Financial Affairs.

There is no doubt in this case that the unfiled tax returns are records from which Lowe's "financial condition and business transactions might be determined." Lowe herself does not know what the income of Fairy Tale and her own income was for those years. The lack of knowledge and information about her income after 2019 is reflected from the creditor perspective in the claims filed by IRS and the State of Ohio Department of Taxation as estimated, which would impact any potential recoveries for other creditors.

UST also argues that Lowe failed to keep other types of records for Fairy Tale, such as profit and loss statements, business ledgers, and documents to be used to complete her delinquent tax returns. The evidence confirms that Fairy Tale never kept such recorded information. The court agrees that Fairy Tale should have at least kept records projecting cash flow, as interrelated with Lowe's obligation to file tax returns and pay her income tax obligations. Her Schedules E/F show that even before the pandemic she had not paid income taxes. The claim of IRS confirms that she was not paying her income taxes as the business revenue increased. The unpaid taxes for 2018 and 2019, the absence of filed state tax returns all together, and the bank records show she disregarded the requirement to make quarterly estimated tax payments. There is no evidence of any payments to IRS or the State of Ohio on account of income tax liabilities. Her rough calculation of what she had to spend on personal expenses from funds left over after Fairy Tale paid its travel consultants' commissions disregarded her tax liabilities and left her and ultimately her creditors, the Chapter 7 case trustee and the UST guessing what her Form 1040 Schedule C and personal AGI amounts would look like. Ultimately the absence of records analyzing her cash flow and enabling her to adjust personal expenditures resulted in unsustainable borrowing from MCA lenders and the final downfall of the business against the background of the pandemic. The lack of such records is part and parcel of her failure to pay her income taxes for years and to file income tax returns. While Fairy Tale superficially looked successful as its revenue grew leading up to the pandemic, the absence of records to enable Lowe to account for her state and federal tax obligations prevented understanding her true financial condition.

The UST sustained his burden of proving and the court finds that Debtor failed to keep recorded information from which her financial condition and business transactions might be ascertained within the meaning of § 727(a)(3).

Second Element: Whether Debtor's Failure to Keep and Maintain Recorded Financial Information was Justified Under the All of the Circumstances of the Case

Plaintiff having met its burden of showing that Debtor failed to keep records from which her financial condition or business transaction might be ascertained, the burden shifts to her to show that she was justified under all of the circumstances of the case in failing to do so. *In re Devaul,* 318 B.R. at 829. "The issue of justification depends largely on what a normal, reasonable person would do under similar circumstances. The inquiry should include the education, experience, and sophistication of the debtor; the volume of debtor's business; the complexity of the debtor's business; the amount of credit extended to debtor in his business; and any other circumstances that should be considered in the interest of justice." *In re Devaul,* 318 B.R. at 837 (quoting *Meridian Bank*, 958 F.2d at 1231).

Lowe asserts four justifications for failing to file her tax returns. Debtor argues somewhat paradoxically that, first, she lacked records necessary to prepare the missing returns, and second, that there is nevertheless a large volume of documents from the business in evidence. Third, she was overwhelmed and incapable of preparing tax returns for 2020, 2021 and 2022. Fourth, by the time she filed for bankruptcy she lacked the funds to engage needed professional help to file the missing returns. The court finds these reasons insufficient to meet Debtor's burden of showing justification for the failure, whether considered individually or collectively.

As to her first argument, the evidence includes the recorded information that Lowe testified she used to prepare her own tax returns using Turbo Tax through 2019, at least her federal income tax returns. They are the Trustmark 9304 and other bank account records for all relevant periods of time and the PayPal statements, the latter which the UST was able to subpoena. Lowe testified that together those records were sufficient to enable her to and that she did prepare Form 1099s for all of Fairy Tale's independent travel agents through closure of the business, including for the partial year of 2022. [Ex. 6]. The Trustmark 9304 bank account records showing receipts and disbursements, the PayPal records, TESS ledgers (of which a sample is in evidence) and spreadsheets from the travel consultants (of which there are none in evidence) were also the basic records she used to run Fairy Tale and prepare her returns.

Lowe referred several times to being informed that she could obtain certain records from IRS, but that she was unable to for reasons that are both unclear and unpersuasive. Although it is not clear what those documents are, the court surmises that they were Form 1099s for Fairy Tale from vacation suppliers such as Disney. To the extent they were necessary, Debtor did not try very hard to obtain them. Moreover,

Fairy Tale commission deposits are shown on the available Trustmark 9304 account records as a basis for reconstructing them herself. The court rejects the argument that missing records and documents justify her failure to prepare or have prepared and file income tax returns.

Lowe's second argument that she produced voluminous documents to Plaintiff, which justifies the failure to prepare and file tax returns themselves or maintain cash flow records is equally unpersuasive. The court rejects that the production of underlying records necessary to determine her income and income tax situation justifies her failure to prepare and file tax returns. This is casting the burden on Plaintiff, the Chapter 7 case trustee and her creditors, which is improper given her education, experience, background and business capabilities. Through 2019, with the unexplained exception of missing State of Ohio tax returns, Lowe prepared her own tax returns using TurboTax. Lowe presented as an educated (associate's degree), experienced and capable businesswoman. In 2019, her gross receipts from Fairy Tale were $1,366,663 and her personal taxable income was $218,678. [Ex. 28]. Her largest and most important supplier was Disney, which she had cultivated over the years to enhance the business opportunities of Fairy Tale, its travel consultants and the end customer. The Fairy Tale business model and operations were not complex or technical. The overhead was minimal. She successfully recruited more than a hundred independent travel consultants. Lowe is not a debtor whose failure to file actual income tax returns can be excused by availability of the underlying records to other parties in interest. As a privilege of discharge, the UST, the Chapter 7 case trustee, and her creditors do not have to and cannot be expected to piece together a debtor's financial circumstances from source documents, especially to show income as one of the most fundamental of a debtor's financial circumstances. That Debtor cannot prepare her own income tax returns but suggests that the quantity of records provided enables other parties in interest to figure out her income and business transactions is exactly backwards. Quantity of recorded information is not a proxy in this case for the quality of records necessary to meet the statutory standard of §727(a)(3). Instead, the volume of the underlying records enhances the importance of having filed tax returns.

Lowe's third argument is that she was incapable of filing tax returns because she became overwhelmed by the pandemic, the sudden damage it caused Fairy Tale's business and difficult personal circumstances. Of the reasons Lowe advances as justification for not filing her income tax returns, this is the most serious to the court. Yet the court finds that Lowe being overwhelmed as described does not justify her failure to file income tax returns for 2020, 2021 and 2022. She had the documents necessary to do so. She found time to take trips, both for business and personally. She assisted her daughter financially in setting up her own business, funds that could have been used to engage professional tax preparation

assistance as the financial picture of Fairy Tale became more complex with borrowing. The court sees Debtor's failure to file tax returns altogether for 2020, 2021, and 2022 as an extension of Debtor's failure to take steps during more normal times to account for her income tax obligations through estimated payments and even to file state tax returns for 2019 according to the State of Ohio claim. During good times and bad, Debtor's lack of attention to her income tax obligations stands out to the court. The IRS claim for unpaid income taxes in tax years 2018 and then again in 2019 is glaring as the telling backdrop against which the court evaluates Debtor's justification of being overwhelmed as to 2020, 2021 and 2022 tax returns. There was sufficient time even after the Chapter 7 case was filed until the time of trial for Debtor to have acted. She did not. Nor was medical evidence offered to support that Debtor was incapable of acting to prepare, or get prepared, and file income tax returns at any particular time. Individual debtors are generally overwhelmed by the combination of financial and often personal distress that accompanies a bankruptcy filing, many less capable than Debtor. Excusing compliance with fundamental obligations around preparation and filing of tax returns as a condition of a Chapter 7 discharge under the circumstances advanced by Debtor, which the court acknowledges as difficult, would degrade the Bankruptcy Code. Debtor has failed to persuade the court that her situation was so unusual that basic record keeping obligations can be overlooked as justified.

Likewise, Debtor's asserted lack of financial resources to engage professional assistance to prepare and file the missing tax returns does not excuse their timely preparation and filing. *Peters v. Michael (In re Michael),* 433 B.R. 214, 225 (Bankr. N.D. Ohio 2010) (court rejects debtor's financial difficulties, which are inherent in bankruptcy cases, as adequate justification for failure to keep, maintain and produce financial records). For years Lowe prepared her own tax returns and Form 1099s for the Fairy Tale independent travel consultants. While the increased complexity of Fairy Tale's financial structure through borrowing from the federal government and merchant cash advance lenders advocated for professional tax preparation assistance, Lowe needed to adjust her expenditures to account for those expenses. Not doing so exposes the same lack of records honestly showing Fairy Tale's true financial condition and thus her own that resulted in substantial unpaid income tax debts even before the pandemic. Allowing insolvency as routine justification for failure to file tax returns and keeping other basic recorded information as conditions of discharge would gut the disclosure obligations that are part of the Bankruptcy Code's *quid pro quo* for obtaining a discharge. The court is not persuaded that under the circumstances of this case Debtor's lack of resources to engage professional tax preparation assistance justifies her failure

to prepare tax returns. After all, she spent over $8,000 assisting her daughter in setting up her own business.

Debtor has not met her burden of showing justification for her failure to keep and maintain recorded information from which her financial condition might be ascertained. The court will deny her discharge under § 727(a)(3).

**III. 11 U.S.C. § 727(a)(4)**

A debtor will be denied a discharge if she "knowingly and fraudulently, in or in connection with the case—(A) made a false oath or account." 11 U.S.C. § 727(a)(4)(A). "Complete financial disclosure is a prerequisite to the privilege of discharge." *In re Keeney*, 227 F.3d at 685. The fundamental purpose of § 727(a)(4)(A) is to ensure that the trustee and creditors have accurate information without having to do costly investigations. *In re Zhang*, 463 B.R. at 86. "The emphasis is upon complete disclosure in the initial pleadings that will mold the actions of trustees and creditors, based upon reliable information. Even a single omission may warrant denial of a discharge." *In re Elsass*, 597 B.R. 860, 870 (Bankr. S.D. Ohio 2019).

A false oath objection to discharge requires the objecting party to prove by a preponderance of the evidence that: "1) the debtor made a statement under oath; 2) the statement was false; (3) the debtor knew the statement was false; 4) the debtor made the statement with fraudulent intent; and 5) the statement related materially to the bankruptcy case." *In re Keeney,* 227 F.3d at 685.

One of the documents a debtor must file in connection with commencement of a case is a Statement of Financial Affairs. 11 U.S.C. 521(a)(B)(iii); Fed. R. Bankr. P. 1007(b)(1)(D), (c)(1). It must be prepared on the prescribed Official Form, which is B107. Fed. R. Bankr. P. 1007(b)(1). The form requires the debtor's signature and verification that the information provided is true and correct, subject to penalties of perjury. Official Form B107; Fed. R. Bankr. P. 1008. A debtor must also appear and provide testimony under oath at a meeting of creditors. 11 U.S.C. §§ 341, 343; Fed. R. Bankr. P. 2003(b)(1)(A). Debtor filed her required Statement of Financial Affairs with her petition. [Ex. 1, pp. 76-83/109]. She also appeared for the meeting of creditors. [Case No. 22-31438, Doc. # 26].

Plaintiff argues that Debtor made the following false oaths on her Statement of Financial Affairs: (1) failure to disclose that she had a storage unit within the year before she filed for bankruptcy; (2) failure to disclose that she transferred approximately $60,000 to her daughter either directly or by payment of her

debts during the two years before Debtor filed for bankruptcy; (3) failure to disclose that she sold her former residence within two years before she filed for bankruptcy; and (4) failure to disclose the $13,412 in transfers to Heather McGregor. Further, Plaintiff argues that these false oaths were compounded when she reiterated the accuracy of her filings under oath at the meeting of creditors.

Errors and omissions from a debtor's bankruptcy schedules and statements can constitute false oaths under § 727(a)(4). *McDermott v. French (In re French)*, 592 B.R. 653, 656-58 (Bankr. E.D. Mich. 2018). Statements made under penalties of perjury are considered to be made under oath. *Id.* at 659; 28 U.S.C. § 1746. A debtor's testimony at a Section 341 meeting of creditor's is also under oath. 11 U.S.C. §343. As all the statements raised by Plaintiff were made on Debtor's Statement of Financial Affairs under penalties of perjury and reinforced under oath at the meeting of creditors, they were all made under oath and as to each alleged falsehood. Plaintiff has proven that element by a preponderance of the evidence. The court will in turn address as necessary whether other required elements of proof are met as to each alleged falsehood.

<u>Failure to Disclose Storage Unit</u>

Question 22 on the Statement of Financial Affairs asks: "[h]ave you stored property in a storage unit or place other than your home within 1 year before you filed for bankruptcy?" In response Debtor marked the box for "No." [Ex. 1, p. 81/109].

This question is more nuanced than it might at first seem. It does not ask whether the debtor had a storage unit or other storage location during the year before filing for bankruptcy, but whether debtor stored property in a storage unit or other location during that time. As for the storage unit, it could be somebody else's storage unit. As for whose property was stored, there is room for storage of the debtor's property or somebody else's property. Thus, if Question 22 is answered "Yes", there are follow up inquiries as to name and address of the storage facility, who else had access, a description of the contents, and whether the debtor still has it, which might refer to the contents or to the storage unit. The question is designed to elicit follow-up as a basis for further investigation as appropriate by the trustee or a creditor.

Regardless of interpretation of Question 22, Debtor should have marked the box for "Yes" and answered the follow up inquiries. Her answer was false. Debtor acknowledged at trial that she was aware when she signed her bankruptcy documents that she leased a storage unit within one year prior to filing. It was in her name, and she paid rent on it. Between December 13, 2021, and June 3, 2022, she paid $816

in rent to CubeSmart for a storage unit. She did have property of hers in it, as well at the outset property that was her daughter's.

Regardless of whether the other elements are met, the court finds that Debtor did not omit disclosure of the storage unit and the follow up information at Question 22 with fraudulent intent. Regarding the element of fraudulent intent, the Sixth Circuit has stated:

> [I]ntent to defraud involves a material misrepresentation that you know to be false, or, what amounts to the same thing, an omission that you know will create an erroneous impression. A reckless disregard as to whether a representation is true will also satisfy the intent requirement. Courts may deduce the fraudulent intent from all the facts and circumstances of a case. However, a debtor is entitled to discharge if false information is the result of mistake or inadvertence.

*In re Keeney*, 227 F.3d at 685-86 (citations and quotations omitted). While a false statement that is made by mistake or inadvertence is not sufficient grounds upon which to base denial of discharge, a false statement or omission made by a debtor with reckless indifference to the truth may suffice to show intent to defraud depending on the totality of the facts and circumstances of the case. *In re French,* 592 B.R. at 657-58.

Plaintiff's proof falters on whether Debtor made the false statement with intent to defraud. Debtor testified that she initially rented the storage unit to help her adult daughter Emma, which is an ongoing theme in their lives, in this case and in Debtor's testimony. The items initially placed there were her daughter's stove and a refrigerator purchased for her by her father. Debtor estimated the appliances were about a year old when placed in the storage unit. After a while, Debtor put some of her own tubs containing a deceased daughter's clothing and teddy bears in the storage unit because there was space, although Debtor does not recall when she did so. Eventually, her daughter moved her things out of the storage unit. What was then left was Debtor's property. Debtor moved her own things out in the summer of 2022 when she moved to the house she lived in at the time of trial. Debtor did not know the value of the items in the storage unit at any given time but said that her own items were of no financial value. As she testified with respect to her own property, "I didn't think of those as being anything of value besides sentimental."

The court finds that Debtor's testimony overall shows a lack of intent to defraud or even reckless disregard around her omission of the storage unit in response to Question 22. Lack of value and materiality of property to creditors (in this case the MCA lenders), a Chapter 7 case trustee and the UST are not for a debtor to meter in honoring financial disclosure obligations. *Hernandez v. Shove (In re Shove)*, 629 B.R. 96, 116 (Bankr. D. Mass. 2021); *United States Trustee v. Zimmerman (In re Zimmerman),* 320 B.R. 800,

808 (Bankr. M.D. Pa. 2005); *see Allard v. Hussan (Matter of Hussan)*, 56 B.R. 288, 292 (Bankr. E.D. Mich. 1985) (it is not for the debtor to determine which assets should be disclosed to his creditors rather it is debtor's role to consider the question carefully and answer it completely and accurately." (citations and quotations omitted). Nevertheless, lack of value can be indicative of a lack of fraudulent intent. *Fogal Legware of Switzerland, Inc v. Wills (In re Wills)*, 243 B.R. 58, 64 (B.A.P. 9th Cir. 1999); *Cadle Co. v. Zofko (In re Zofko),* 382 B.R. 45, 48 (Bankr. W.D. Pa. 2008), aff'd sub nom. *Cadle Co. v. Zofko*, 2009 WL 10687816 (W.D.Pa. Feb. 26, 2009) (collecting cases for proposition that while value of an asset is not determinative as to the "materiality" element, insignificant or trivial value may be a factor supporting a finding of non-fraudulent intent). As Debtor's growing financial distress upended her life in closing her business, changing jobs, selling her home and keeping her family going, the storage unit involved her daughter's things and intensely personal property of her own that did not in her mind cross the radar of debtor-creditor issues. It was a personal family matter to her.

The court finds that Plaintiff has not proven by a preponderance of the evidence a violation of § 727(a)(4)(A) with respect to Debtor's response to Question 22 on the Statement of Financial Affairs.

<u>Failure to Disclose Transfers to and Payments on Account of Her Daughter</u>

Plaintiff points to two other, related questions on Debtor's Statement of Financial Affairs as having been falsely answered in failing to disclose transfers to and for the benefit of her adult daughter Emma. Question 13 asks: "[w]ithin 2 years before you filed for bankruptcy, did you give any gifts with a total value of more than $600 per person." In response Debtor marked the box for "No." [Ex. 1, p. 80/109]. Question 18 asks: "[w]ithin 2 years before you filed for bankruptcy, did you sell, trade, or transfer any property to anyone, other than property transferred in the ordinary course of business or financial affairs." The instructions to Question 18 direct "[d]o not include gifts and transfers that you have already listed on this statement."[5] In response Debtor marked the box for "No." [Ex. 1, p. 81/109].

The factual predicate for Plaintiff's claim under § 727(a)(4)(A) as to these two responses involve payments to, for the benefit of and on account of her adult daughter Emma. Debtor emotionally described Emma as a good person trying to get through school, trying to find her own way financially, working on and off when able, coping with shifting personal relationships and living arrangements, trying to start her

[5] There are other questions on the Statement of Financial Affairs form that ask debtors to report certain transfers: Questions 8, 16, 17, 19. Question 6 asks debtors to report certain payments to creditors, "payments" certainly being transfers under § 101(54). Question 14 asks debtors to report certain gifts to charity. The instructions to Question 18 thus exclude transfers and gifts reported in response to these other questions as well as to Question 13.

own business. Debtor testified that there have been times when Emma could not work due to physical and mental health circumstances that have occurred on and off her whole adult life. Debtor's testimony shows that in her mind Emma was her dependent even though she was an adult. They were a family unit. They lived close to one another and for a time around the bankruptcy filing with one another again. As Debtor's parents supported her when she was young, Debtor felt the obligation to do the same for Emma. That is what families do.

Plaintiff carefully summarized from Debtor's Venmo, PayPal and bank account (Trustmark accounts 9304 and 7629) records payments to and for the benefit of Emma that total $59,845.84 from just October 2020 to July 19, 2022. [Ex 13]. The sheer total amount of documented payments over that length of time shows materiality, although as explained above, amount is not necessarily determinative. However, not only is the total substantial, but the information would also assist the case trustee, the United States Trustee and creditors in understanding how Debtor conducted her financial affairs over relevant time periods, where funds were spent and whether there were further lines of inquiry to be explored to find assets.

Plaintiff also elicited extensive, detailed testimony from Debtor about the payments. Debtor generally denied that payments to and for Emma's benefit, or any specific payment, were intended to avoid creditors or park money, although Emma sometimes reimbursed her for expenditures or advanced funds on Debtor's behalf (such as for Debtor's bankruptcy attorney's fees).

Plaintiff has established elements one (statement made under oath) and five (statements material) as to the payments made to or for the benefit of her daughter.

The court will next address whether Debtor's "No" responses to Questions 13 and 18 are false.

"Transfer" is very broadly defined at § 101(54) of the Bankruptcy Code to mean "each mode, direct or indirect, absolute or conditional, voluntary or involuntary, — of disposing of or parting with (i) property; or (ii) an interest in property." The term "gift" is not defined in the Bankruptcy Code. Given the broad definition of transfer, a gift is a "transfer" under the Bankruptcy Code. Yet the Statement of Financial Affairs form treats them separately to elicit complete information from debtors. Consumer debtors especially would seem unlikely to consider a gift to charity or a family member or other person as a transfer of property; there is no obligation requiring such a transfer nor would the debtor receive anything in exchange for the transfer. Question 18 is focused more on a debtor's business and financial affairs, soliciting where there is a "Yes" response additional information about consideration received in

exchange for the transfer. Question 18 itself expressly includes sale or trade of property as a reportable transfer but then excludes property transferred in the ordinary course of a Debtor's business or financial affairs.

There are two categories of payments Plaintiff has proven that Debtor made to or for the benefit of Emma. The first category seems most aptly characterized as on account of Emma's personal expenses. As explained, Debtor offered credible testimony about Emma, their relationship and their family situation. Debtor's candid Venmo account records are descriptive. While there are entries in them showing payments to Emma in January and February 2020 for things like $200 for "Vday weekend" [Ex. 9, p. 9-2], $200 for "shopping, dinner, gas home" [*Id.*], and even "Clean. Going away gift. Not a loan. Love you" [Ex 9, p, 9-1], there are others such as $53 on August 1, 2020, for "Druggos" [Ex. 9, p. 9-8], $200 on August 9, 2020, for "Food" [*Id*], $50 on October 2, 2020, for "Gas n stuff" [Ex. 9, p. 9-10], $59.00 on April 29, 2021, for "Dr," other various entertainment expenses and medical expenses. The Trustmark 9304 account records show payment of apartment rent for Emma from January 5, 2021, through June 15, 2022 (Northlake Village and Monarch Investments). [Ex. 13]. There are also several payments from Emma to Debtor shown. Even when expressly called a "gift," the payments are shown as ongoing, back and forth, routine and of a consistent pattern effectively within a functioning family unit throughout the duration of the records in evidence. Of the $59,845.84 payments summarized by Plaintiff made from October 1, 2020, through June 30, 2022, $54,207.94 is on account of what the court characterizes as Emma's living expenses. [Ex. 13 ($35,227.16 through Venmo; $16,958.33 for apartment rent to Northlake Village and Monarch Investments through Trustmark 9304); $2,022.45 through PayPal for Mostly Moe, Moe being Emma's longstanding nickname)]. In a technical sense, these payments are gifts. "The Bankruptcy Code does not except a debtor's prepetition transactions with family members from disclosure." *Jahn v. Hughes (In re Hughes)*, 490 B.R. 784, 792 (Bankr. E.D. Tenn 2013). Debtor did not have any legal obligation to support Emma during this period as with a dependent minor child.

Nevertheless, the court finds that they are not gifts within the meaning of Question 13 that were required to be disclosed based on the evidence in this case. This determination comports with the principle that the provisions of § 727 are to be strictly and narrowly construed in favor of a debtor because the denial of discharge is a harsh remedy. *United States v. Storey*, 640 F.3d at 743. Debtor's "No" response to Question 13 is not false as to the $54,207.94. There are a demonstrated pattern and routine practice with respect to the $54,207.94 in expenditures to and for Emma's benefit throughout the time period shown on the records that predates the pandemic and Debtor's increasingly obvious cash flow problems as 2022

wore on. *See United States Trustee v. Varner (In re Varner)*, Case No. 14-61103, Adv. No. 14-6021, 2015 WL 4039390, at *11 (Bankr. N.D. Ohio June 30, 2015) (in a case involving non-disclosure of a laptop for a minor son and jewelry for a girlfriend, "In the normal day-to-day usage of the word 'gift,' very few people would consider the purchase of clothes, food, or other such items for their dependents as gifts."). They are not one-off gifts as in *In re Hughes*, where the debtors received an undisclosed pre-petition settlement distribution of $43,806.00 and gave gifts of $3,500 to each of their two children and $3,000 to an aunt as a loan repayment within 90 days of their Chapter 7 petition, which also were not disclosed on their Statement of Financial Affairs. *Id.* at 791. Or as in *SunTrust Bank v. Mitchell (In re Mitchell)*, 496 B.R. 625, 629, 635-36 (Bankr. N.D. Fla. 2013), where debtors failed to disclose on their Statement of Financial Affairs that within seven months of filing their petition, they gave $16,000 to their 25-year-old daughter said to be for an advanced degree although she was not enrolled in any graduate program. Or as in *In re Urbonas,* 539 B.R. 533, 540 (Bankr. N.D. Ill. 2015), where debtors failed to disclose $32,000 in cash gifts to family members, including $25,600 to adult children living abroad or in different cities; their gifts commenced shortly after they first met with bankruptcy counsel. *But cf. Globe Financial Leasing Services, LLC v. Tello (In re Tello)*, 640 B.R. 181, 195, 204-05 (Bankr. D.N.D. 2022) (undisclosed payments to adult son for college tuition).

Rather, as to the $54,207.94, the court finds persuasive under these circumstances the thoughtful analysis in *Manning v. Watkins* (*In re Watkins*), 474 B.R. 625, 647-648 (Bankr. N.D. Ind. 2012), which involved undisclosed $600 monthly payments to one of the debtors' mothers to supplement her ordinary living expenses, "not for luxury expenses; not as a method of hiding money that the debtors would themselves use; not as a transfer which benefitted the debtors in any way in their personal financial dealings." While the court in *In re Watkins* reluctantly held that debtors technically should have disclosed the payments as gifts on their Statement of Financial Affairs, the court described the payments of parental support as "a fairly esoteric" gift that "most under the circumstances would not view it as such." *Id.* In a nutshell, that describes Debtor's mindset in this case, as shown by her trial testimony. Thus, even if Debtor should have disclosed the $54,207.94 in payments as gifts in response to Question 13, as the court in *In re Watkins* decided, the court finds that her non-disclosure was not made knowingly or with fraudulent intent based on the overall circumstances in this case.

Nor in the court's view was Debtor required to disclose these payments in response to Question 18, as evidence shows they were made in the ordinary course of her financial affairs over the years for

which records are in evidence.[6] *See In re Tello*, 640 B.R. at 205. Debtor's "No" response to Question 18 is not false as far as Emma's living expenses are concerned. Likewise, even if they should have been disclosed in response to Question 18 instead of Question 13, the court finds that Debtor did not fail to do so knowingly and with fraudulent intent.

The second category of payments shown on Exhibit 13 are payments on account of Debtor's daughter's fledgling nail and manicure business called Studio 808 LLC. Emma was the statutory agent and 100% owner of the LLC. The court finds that those payments are in the total amount of $5,637.90 ($4,275 in salon rent to Rick Michael through Trustmark 9304; $1,362.90 in miscellaneous expenses through Trustmark 7629). These payments were all made in 2022, starting in January 2022 and continuing through July 2022. They are different than the living expenses described above and are more akin to the one-off expenses that are not the product of parental support for the family unit. They were not routine and ongoing through the period starting in October 2020 shown by the evidence. Seeding a family member's new business expenses at a time when your own business is collapsing (a fact that should have been apparent to Debtor before it was, according to her testimony), you've turned to MCA lenders and they are withdrawing unsustainable amounts from your checking account, is a different situation. Nor were these payments of the kind that were in the ordinary course of Debtor's financial affairs given their circumstances. *See id.* (court finds debtors' testimony insufficient to show transfers to the debtor's daughter were made in the ordinary course of their financial transactions under § 727(a)(4)). The court finds that these amounts should have been disclosed, either as gifts to Emma in response to Question 13 or otherwise as transfers in response to Question 18. To the extent the expenses paid for setting up Emma in business were not disclosed in response to either Question 13 or Question 18 of her Statement of Financial Affairs, Debtor's response to at least one of those questions is false.

The court finds that omission of the payments on account of setting up Emma's business are material. Especially as Debtor closed down Fairy Tale and made other transfers in doing so, Debtor's payments in support of Emma's business, especially rent out of the Trustmark 9304 account from which the MCA lenders were taking automatic periodic withdrawals, helps show the full scope of Debtor's business dealings and disposition of property during a key time period leading up to her bankruptcy filing. *See Keeney*, 227 F.3d at 685-86; *see also Crocker v. McWhorter (In re McWhorter)*, 557 B.R. 543, 557

[6] The court also thinks that Debtor had no idea of the overall magnitude of the total transfers made to or on account of Emma for support and living expenses as shown by Exhibit 13. She testified that she could not recall whether "gifts" to Emma reached $600 or more during the two years preceding the petition and that she did not know the total 2022 rent she paid for Emma's business studio. That is more a problem, however, with her lack of appropriate recordkeeping, which has been addressed above.

(Bankr. E.D. Ky. 2016) ("Materiality is a broad standard under Sixth Circuit precedent[.]"). Nor is the total amount of the transfers during the seven months in 2022 insignificant or forgettable, although Debtor credibly testified that she did not know how much studio rent she paid for the salon.

The crucial questions are whether Debtor acted knowingly and with fraudulent intent in not disclosing the payments on account of Emma's business. While the payments on account of Emma's salon business should have been disclosed in the court's view, the court finds that Plaintiff has not proven by a preponderance of the evidence that Debtor knowingly omitted them from her Statement of Financial Affairs with fraudulent intent.

At trial, Debtor testified that she did not disclose payments for Emma because she did not see a place to disclose them. That testimony comports with the credible testimony that she generally considered payments advanced to and on account of Emma as family support, not as a traditional gift, not as loans and not as a relevant business matter. The court acknowledges that, as one size fits all forms, sometimes the forms and terms within a bankruptcy petition do not neatly apply to a particular debtor's financial circumstances. The court disagrees that the business payments were like the payments for personal expenses shown in Exhibit 13. But Debtor honestly did not make that differentiation even though the court believes she should have. Debtor was asked whether, in the two years before her bankruptcy filing, "did you make any transfers of money or property to your daughter?' She responded that "I gave her money as a mom, but I didn't transfer property." In response to the follow up "[y]ou transferred funds to her, though?", Debtor answered, "Gave her money, yes." While money is undoubtedly a form of property, Debtor's response shows she did not think of it in that light, which is relevant to responding to Question 18. *Cf. C & H Electrical v. Newell (In re Newell),* 321 B.R. 885, 888 (Bankr. N.D. Ohio 2005) (debtor's non-disclosure of transfers of two vintages autos, furniture, a boat, a travel trailer and storage cabinets). Hence, Debtor's credible testimony that she did not disclose the payments for Emma, including the business payments in 2022, because she did not see a place to disclose them. Her nondisclosure of the business payments, as with the personal expenses, was not done knowingly.

As to whether Debtor's non-disclosure of payments for Emma's salon business was made with fraudulent intent or reckless disregard for whether they should have been disclosed, courts may infer the necessary intent from the totality of circumstances of a case. *In re Keeney,* 227 F.3d at 684-85. These circumstances include the extent and degree of the misinformation and whether the debtor had a motive for the disinformation. *In re Newell*, 321 B.R. at 890-91.

The court acknowledges that the degree of misinformation as to the business payments is not insignificant, given their timing in 2022 and the amount. Nevertheless, the court can discern no motive for Debtor to conceal this information. By the time she filed her petition on September 27, 2022, Emma's business had already closed in late spring or early summer, and Emma was living with Debtor. There was nothing for Debtor to shield or protect involving her own income or assets or Emma's business suggestive of a motive to maintain secrecy around the payments. Nor would disclosure of the payments for Emma's business have risked financial or other loss to Debtor in the same way nondisclosure of transfer of a boat or the existence of a bank account or other asset might. A lack of motive for non-disclosure weighs against finding fraudulent intent. *Bernhardt v. Radloff (In re Radloff)*, 418 B.R. 316, 323-24 (Bankr. D. Minn 2009).

Plaintiff nevertheless points to notations on records in 2022 reflecting directives to Emma "to hold funds." Such instructions were given to Emma in May 2022, suggestive of an overall disregard for the rights and interests of creditors. On May 27, 2022, Debtor advanced $2,000 to Emma, with a notation: "You can use up to $250. And pay $250 toward your credit card. Stash the rest of it in your bank." [Ex. 11, p. 11-9]. Then on June 10, 2022, a transfer of $753 to Emma described as "CC tickets plead hold." [Ex. 11, p. 11-10]. While acknowledging that she was sure that over the years she had instructed Emma to hold funds for her and not spend them, Debtor denied generally that she transferred money to Emma and paid her bills to keep funds out of Debtor's bank account and by inference the reach of the MCA lenders. As for the May directive, Debtor testified that Emma was going on a trip, which the entry confirms, and that she did not want Emma to spend all the money traveling. Debtor also pointed out that the payment came from her Venmo balance, not from the Trustmark 9304 account from which the MCA lenders were withdrawing funds. Rather than being indicative of an overall intent to withhold material information from the trustee, Plaintiff and her creditors, these notations are products of particular circumstances and the manner in which Emma conducted her financial life; the court notes from the transfer description on the records in evidence that Emma was not shy about taking trips and pursuing opportunities for entertainment when perhaps she should not have and should not have been financed to do so by Debtor.

The court finds that Debtor's omission of payments in support of Emma's business from her Statement of Financial Affairs was not done with fraudulent intent or reckless disregard for whether they should have been disclosed.

Plaintiff not having proven all five of the requisite elements for denial of discharge under § 727(a)(4)(A) with respect to all or any of the total of $59,845.84 that Debtor did not disclose on her Statement of Financial Affairs, the court will not deny Debtor's discharge on that basis.

<u>Failure to Disclose Sale of Former Residence</u>

As described above, Debtor answered "No" to Question 18 on the Statement of Financial Affairs, which asks: "[w]ithin 2 years before you filed for bankruptcy, did you sell, trade, or transfer any property to anyone, other than property transferred in the ordinary course of business or financial affairs." Plaintiff alleges that Debtor also should have disclosed the sale of her former residence in response to Question 18.

Debtor owned a home located at 749 South Primrose, Lima, Ohio, 45805. She did not own it when she filed her bankruptcy petition on September 27, 2022, having sold it in 2021. Based on a deposit shown on Exhibit 18, which is some of the monthly statements for the Trustmark 9304 account, Debtor acknowledged that she sold the property in April, 2021. [Ex. 18, p. 18-59]. The account statement for April 2021 contains an entry on April 26 that shows a deposit of $100,596.50. Debtor acknowledged at trial that the deposit was proceeds from the sale of her house. Although she did not recall the gross sale price, this amount represented the total sale price minus commission and fees, the exact amount of which she also did not recall. After depositing the funds in the Trustmark 9304 account, Debtor testified that she used the proceeds for both business and personal purposes, including rent for her new living quarters. She affirmed that, as of the bankruptcy petition date, she was aware that she sold the house in 2021. The sale was not disclosed in response to Question 18 or otherwise in her petition filings. When asked about why it was not disclosed at Question 18, Debtor testified that she did not understand the question. She also stated that "I did not consider my house part of that," indicating confusion about whether the house sale should have been disclosed. When pressed why she did not think the question pertained to selling a home, Debtor stated "I don't know what I didn't understand about it, but I didn't think that would pertain to selling a home." Debtor testified that, other than the 2021 house sale, she previously sold another home in 2013. She never operated as a real estate agent who generally sells homes, and the sale was not otherwise through her Fairy Tale business. By September 2022 when she filed her petition, none of the sale proceeds remained.

The court finds that the sale of Debtor's home occurred on or about April 26, 2021, the date of the deposit. That is within the two-year time frame about which Question 18

inquires.[7] The question asks Debtor, "did you sell, trade, or otherwise transfer any property to anyone." Debtor did. Nor, her testimony shows, did she sell it in the ordinary course of her business or financial affairs. The court finds that Debtor's "No" response to Question 18 is false.

The court also finds that the sale of the house relates materially to the Chapter 7 case. Not only were the net proceeds in the six figures substantial in amount, but the information also "bears a relationship to the bankrupt's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence or disposition of his property." *In re Keeney*, 227 F.3d at 686. The information about sale of her house and use of the proceeds directly concerns the existence and disposition of property and potentially discovery of assets. While materiality has a fairly low threshold in this context, *Carter-Jones Lumber Co. v. Beatty (In re Beatty),* 583 B.R. 128, 139 (Bankr. N.D. Ohio 2018), information and documents about sales of real and other property and disposition of proceeds are routinely sought by Chapter 7 trustees to investigate potential avoidance actions.

A debtor knows the truth of a statement if he or she did not disclose correct information while being aware of it. *In re Motil,* 2023 WL 3991639, at *28 (citation and quotations omitted). Debtor admitted she knew and was aware that she had sold her house in Lima in 2021 at the time she filed her petition.

As to whether Debtor failed to disclose the sale with the requisite fraudulent intent, the court finds that she did. In the Sixth Circuit under *In re Keeney,* a reckless disregard for the truth suffices to meet this standard. The court finds that Debtor acted with reckless disregard for the truth of her "No" response to Question 18. Debtor's statement that she did not think sale of the house "was part of that" is not credible. No reason why is offered. While there is room for confusion under the circumstances of this case about responding to Question 13 around what is a "gift" and whether a sale or transfer of property within the ambit of Question 18 has occurred when cash is involved, there is no such room in responding to this question when real estate has been sold. As the court in *Matter of Hussan*, 56 B.R. at 292 (citations and quotations omitted), noted, it is not for the debtor to determine which assets should be disclosed to creditors, rather it is debtor's role to consider the question carefully and answer it completely and accurately. Debtor's "No" response shows that she did not do that, which is indicative of a reckless disregard for the truth even in the absence of active fraudulent intent.

---

[7] In closing, Debtor's lawyer argued that the sale did not have to be disclosed because it occurred just outside the time window for which the Statement of Financial Affairs solicited information. That argument is incorrect, as the house was sold on or about April 26, 2021, and Debtor filed her petition on September 27, 2022.

The court finds that Plaintiff has established by a preponderance of the evidence all five elements of his cause of action under § 727(a)(4)(A) with respect to non-disclosure of the sale of Debtor's house in 2021.

Failure to Disclose Certain Payments to Heather McGregor

Plaintiff argues that Debtor failed to disclose the $13,412[8] in transfers to Heather McGregor on her Statement of Financial Affairs and that she should have. The questions to which disclosure of the transfers might apply are 8, 13 and 18. All were marked "No."

As described above, the $13,412 in transfers to Heather McGregor are shown on Exhibit 8 and were made from the PayPal account from 6/17/22 to 7/27/22. There were seven payments: $5,100 on 6/17/22; $1,400 on 6/24/22; $2,500 on 7/1/22; $300 on 7/7/22; $700 on 7/14/22; $1,800 on 7/23/22; and $1,612.31 on 7/27/22. The court made a finding above that these payments were made to McGregor so that she could use the funds to pay Fairy Tale travel agents' commissions that they were owed based on completed trips.

Question 8 asks debtors "[w]ithin 1 year before you filed for bankruptcy, did you make any payments or transfer any property on account of a debt that benefitted an insider?"[9]

"Insider" is a defined term under the Bankruptcy Code. 11 U.S.C. § 101(31). If the debtor is an individual, the relevant category that might apply to McGregor is a "relative of the debtor…." "Relative" is also a defined term under the Bankruptcy Code. 11 U.S.C. § 101(45). It mean "an individual related by affinity or consanguinity within the third degree as determined by the common law, or individual in a step or adoptive relationship within such third degree. McGregor has been identified only as Debtor's sister-in-law.

The Bankruptcy Code does not clarify which common law (state civil law, state common law, federal common law) applies to this determination. However, the Advisory Committee Notes to Bankruptcy Rule 5002 offer clarity, as follows:

> A relative is defined in § 101(34) [now § 101(45)] of the Code to be an "individual related by affinity or consanguinity within the third degree as determined by the common law…" Persons

[8] Plaintiff does not argue that the $7,767.44 in payments that match the Form 1099s issued by Fairy Tale to McGregor for calendar year 2022 should have been disclosed.

[9] Courts also recognize for some purposes under the Bankruptcy Code the concept of a "non-statutory insider." *See, e.g., In re Licking River Mining Co, LLC,* 571 B.R. 241, 251-252 (Bankr. E.D. Ky. 2007). "Non-statutory insider" status is characterized as involving a sufficiently close relationship with a debtor or one where control or influence is exerted over a debtor such that closer scrutiny of that person's conduct is justified. Given the amorphous and fact-dependent nature of that concept, the court rejects it as valid for purposes of denying a debtor a discharge under § 727(a)(4) based on undisclosed transfers under Question 8.

> within the third degree under the common law system are as follows: first degree--parents, brothers and sisters, and children; second degree—grandparents, uncles and aunts, first cousins, nephews and nieces, and grandchildren; third degree—great grandparents, great uncles and aunts, first cousins once removed, second cousins, grand nephews and nieces, great grandchildren…."

Fed. R. Bankr. P. 5002 advisory committee's note. Courts have arrived at different decisions as to where to look to discern the common law of consanguinity. The Bankruptcy Court in *Ehrenberg v. Halajyan (In re Victory Entertainment Inc.),* 634 B.R. 90 (Bankr. C.D. Cal. 2021), offers a thorough and persuasive analysis. It concludes that reference to legislative history is appropriate, which in turn leads to the conclusion that Congress intended English law of consanguinity to apply for purposes of the Bankruptcy Code. The bottom line of the English law of consanguinity as set forth by the court in *Victory Entertainment* is that one must start with a common ancestor and "reckon downwards." *Id.* at 95-96. That necessarily requires, however, that there be a common ancestor. The relationship of sisters-in-law does not generally involve a common ancestor, nor is there any evidence in this case to show that Lowe and McGregor have a common ancestor. The court finds that McGregor is not an insider of Lowe under the Bankruptcy Code definition. *But cf. In re Eifler,* 2013 WL 3300639, at *27-28 (Bankr. W.D. Ky. July 1, 2013) (in denial of discharge adversary as to § 727(a)(4) claim, transfer of $20,000 to sister-in-law should have been disclosed in SOFA, referring to sister-in-law as "insider," but it is unclear whether Question 8 or one of the other questions about transfers is involved); *In re Evans,* No. 2:14-AP-01619-VZ, 2017 WL 3429023, at * 6-7 (B.A.P. 9th Cir. Aug. 9, 2017) (implies without analysis that a sister-in-law is an insider). As a result, Debtor correctly answered Question 8 "No" in not disclosing the $13,412 in payments to McGregor. Plaintiff has not proven the element that Debtor's "No" response to Question 8 was a false statement as to these payments.

Question 13 of the Statement of Financial Affairs asks debtors "[w]ithin 1 year before you filed for bankruptcy, did you give any gifts with a total value of more than $600 per person?"

Based on the court's finding that that the $13,412 in payments to McGregor were made as a conduit so that she could use the funds to pay Fairy Tale travel agents' commissions that they were owed based on completed trips, the court finds that they were not gifts required to be disclosed in response to Question 13. Lowe credibly testified that Lowe orally confirmed to her that the funds were used to pay the commissions. Debtor correctly answered Question 13 "No" in not disclosing the $13,412 in payments to McGregor. Plaintiff has not proven the element that Debtor's "No" response to Question 13 was a false statement as to these payments.

As described above with respect to nondisclosure of the sale of Debtor's former residence, Question 18 on the Statement of Financial Affairs asks debtors "[w]ithin 2 years before you filed for bankruptcy, did you sell, trade, or transfer any property to anyone, other than property transferred in the ordinary course of business or financial affairs." Debtor's payments to McGregor to enable her to pay agents' commissions were "transfers" of property. Nor were they made in the ordinary course of Debtor's business or financial affairs. Quite the contrary. Debtor acknowledged that she could no longer pay the Fairy Tale agents directly as she had over the life of the business. The transfers of funds to McGregor were a workaround as she closed the business down. The court finds that "Debtor's "No" response to Question 18 as to the $13,412 in payments to McGregor was a false statement.

The court finds that these payments relate materially to the Chapter 7 case. Not only is the total amount of the payments significant, but the information bears a direct relationship with the Debtor's business transactions and dealings as she wound down the operations of Fairy Tale. The transfers to McGregor concern her final business dealings and disposition of her property and are exactly the type of information the Trustee and Debtor's creditors would commonly evaluate to determine existence of potential avoidance actions as an asset for the estate and source of recovery for creditors. It should not come to light only through exhaustive review of bank and other account records.

Debtor's non-disclosure of her transfers to McGregor was done knowingly. They occurred in June 2022 and as late as July 27, 2022, contemporaneously with her realization that she needed to consider filing for bankruptcy and consulting counsel. They were an important aspect of her orderly wind down of her business, unlikely to be forgotten.

The court finds that Debtor's non-disclosure at Question 18 of her transfers to McGregor to pay Fairy Tale agents' commissions occurred, at a minimum, with a reckless disregard for the truth of her disclosures. In this context, in contrast to nondisclosure of the payments made to Emma, the question is not opaque.[10] It reaches the heart of why she needed to file for bankruptcy and the financial events leading up to doing so, a non-disclosure the court infers as having been born of a desire to shield McGregor from the bankruptcy mess, an unlikely situation given the listing of McGregor and other Fairy Tale agents as creditors and the growing abuse some of them visited on her as the business closed down.

[10] The court having come to different conclusions about Debtor's intent as to making payments to McGregor versus her nondisclosure of them, the intent element under § 727(a)(2)(A) is different than the intent element under § 727(a)(4)(A). The former addresses intent in making the undisclosed transfers while the latter addresses intent in not disclosing them.

The court finds that Plaintiff has established by a preponderance of the evidence all five elements of his cause of action under § 727(a)(4)(A) with respect to non-disclosure of the $13,412 in payments made to McGregor in June and July 2022.

## **CONCLUSION**

Based on the reasons and authorities stated above, the court finds that Plaintiff has proven his case against Lowe by a preponderance of the evidence as to certain claims under § 727(a)(3) and § 727(a)(4)(A). Plaintiff has not proven his case by a preponderance of the evidence as to claims under § 727(a)(2)(A). Debtor will be denied a discharge in the underlying Chapter 7 case. A separate judgment effectuating this memorandum of decision will be entered by the court.

###